# Exhibit 2

```
         IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

CLAUDIA ENGELHORN, et al,

                        Plaintiff,
    vs.                                     Case Number:
                                            C-24-CV-24-002631

ERIK BOLOG, et al.,

                        Defendant.
_____/

         REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
                      (Motion's Hearing)

                        Baltimore, Maryland

                        Monday, January 27, 2025

    BEFORE:

        THE HONORABLE JEFFREY GELLER, Associate Judge



    APPEARANCES:

        For the Plaintiff:

            PATRICK GARDNER, ESQUIRE

        For the Defendants, Whiteford, Taylor, and
        Preston:

            JOHN J. CONNOLLY, ESQUIRE
            WILLIAM J. MURPHY, ESQUIRE

        For the Defendant Erik Bolog individually and
        as Trustee for the Jareb Irrevocable Trust
        Agreement; Science Park Associates, LLC; and
        Darnestown Road, Inc. et al.:

            DOUGLAS GANSLER, ESQUIRE
            J.B. HOWARD, ESQUIRE
            ZACK SCHRIEBER, ESQUIRE

* Remote Electronic Proceedings Digitally Recorded *

Transcribed by:
Patricia Trikeriotis
Chief Court Reporter
111 N. Calvert Street
Suite 619, Cummings Courthouse
Baltimore, Maryland 21202

                         1
```

1  Plaintiff.

2  But that's not what we're technically doing

3  here.  We're asserting that there's, again, this -- this

4  agreement is not, apparently, not a written one.  So to

5  the extent that there's -- attorney-client agreements can

6  be created in common law as well, and implied in fact as

7  well, and an express written contract.

8  And then I would just note, yes, in closing,

9  the Maryland and position of the Maryland Ethics opinion

10 -- Bar Ethics Committee remains that, since 1990, that

11 attorney -- attorney-client arbitration agreements are

12 improper unless the client is informed of the -- has --

13 is independently represented with respect to making that

14 agreement.

15 And then -- just checking the last of my notes

16 here.

17 Yeah, unless the Court has any other questions.

18 THE COURT:  No.  I don't have any questions.

19 Do counsel for Mr. Bolog want to chime in on

20 the arbitration piece?

21 MR. GANSLER:  Yes, Your Honor, thank you.  And

22 good morning.

23 I just want, for the record, this is Douglas

24 Gansler, counsel for Mr. Bolog and the entities, joined

25 by my colleagues, J.B. Howard and Zack Schreiber on the

30

1  Zoom call.

2  Your Honor, the question -- I suppose the
3  answer to that is, Mr. Bolog, nor any of his entities,
4  ever signed any arbitration agreement of any type.  So
5  were this Court to send the case to arbitration, we would
6  not be involved.

7  With that said, moving on to the discussion we
8  just heard, we would agree with Mr. Connolly that this is
9  an easy decision for Your Honor.  This case should not go
10 to arbitration.  And the reason why that is, is because
11 the sole arbitration clause that occurred in this case is
12 in fact the retainer letter regarding -- and it says,
13 "regarding all claims regarding the estate of Curt
14 Engelhorn."  I'm looking at the February 20th, 2020
15 version.  They're basically all the same in regard to
16 arbitration and the scope of the sole, what they call
17 retainer letter -- we call it engagement letter, same
18 thing -- is that, "You have chosen to engage Whiteford,
19 Taylor, and Preston to provide legal services in
20 connection with your potential claims against the estate
21 of Curt Engelhorn and potential other persons who may
22 come to our attention through the investigation into this
23 matter relating to your forced heir rights or other
24 rights you may have concerning the trust established by
25 him."

31

```
 1            By the time the gift was made or any of the
 2   transactions in this case occurred, that case was long
 3   over, right for Taylor got its $4 million, Ms. Englehorn
 4   got her $130 million as a result of the settlement of
 5   that case, of the Swiss litigation case.  So -- and there
 6   exists no other retainer letters regarding any other of
 7   these matters, so that's it.  I mean, it's that simple.
 8            It's clearly -- look, had there been a
 9   disagreement or an issue that had come up during the
10   course of the Swiss litigation, then of course this
11   exegesis regarding Colorado versus Maryland law and the
12   Rules of Professional Conduct and all those things would
13   come into play.  But here, there is no arbitration clause
14   relevant to any of the issues that are brought in the
15   complaint by the Plaintiff.  So we have no we have no dog
16   in the fight, but it seems clear to me that there is no
17   fight.
18            THE COURT:  All right.  Thank you.
19            Back to Mr. Connelly.
20            MR. CONNOLLY:  Your Honor, I was on mute.  I
21   apologize.
22            With respect to what Mr. Gansler just said, I'm
23   not sure I fully understand it, but it's contrary to what
24   he wrote.  If he's saying that the arbitration clause
25   does not apply to the current dispute, he's totally
```

32

```
 1            I do think this is an easy case.  There's an
 2  arbitration agreement with a broad arbitration provision
 3  that covers all counts of the complaint, and the Court
 4  should order arbitration, and other issues can be
 5  resolved by arbitrators, as they are every day in cases
 6  all across the country by arbitrators, in accordance with
 7  the public policy of all 50 states in the U.S.
 8  government.  So I would ask that the Court grant the
 9  petition to compel.
10            THE COURT:  All right.  Thank you.
11            So taking this a piece at a --
12            MR. GANSLER:  I'm sorry.  This is Doug Gansler.
13  Can I just respond in 30 seconds?
14            THE COURT:  Go ahead.
15            MR. GANSLER:  Thank you.
16            I just responded to Mr. Connolly's discussion
17  that about the language of the arbitration agreement,
18  which does say, "Any claim or dispute arising out of or
19  relating to this agreement, our services under it, or our
20  relationship with you will be resolved by final and
21  binding arbitration," blah, blah, blah.
22            If the suggestion is correct that that somehow
23  anything outside of the Swiss litigation is subject to
24  arbitration, despite not having any arbitration
25  agreements anywhere else on any of the matters, then that
```

37

1   would -- which seems pretty obvious that it does not.
2   That would render the language before, the "or anything
3   to do with our relationship with you," that -- they
4   wouldn't put that in there.  It would say -- where it
5   says, "any claim or dispute arising out of or relating to
6   this agreement," it would -- there would be no need for
7   that or "our services under it," would be -- would be
8   superfluous, and it would -- it wouldn't make sense as an
9   English construct.
10          And I guess what it -- what they seem to be
11  saying -- what Mr. Connelly's argument seems to be saying
12  is that by signing this one retainer agreement that
13  exists between Whiteford Taylor, Mr. Bolog, and Ms.
14  Engelhorn, that's the sole one that exists.  That by
15  saying that any our relationship with you will be
16  resolved, any subsequent, any case, any relationship, any
17  -- any interaction between Ms. Engelhorn and the law firm
18  is going to be resolved by arbitration has to be their
19  argument, and obviously that makes no sense.  So I would
20  just add those to our original thoughts.
21          THE COURT:  Mr. Connolly, since it's your
22  motion, I'll go back to you for the last word.
23          MR. CONNOLLY:  Well, I mean, again, I'd
24  encourage you to read what Mr. Gansler actually wrote in
25  his paper, which is completely contrary to this.  But

38

```
 1              There was a statement that this existence of an
 2   oral agreement between Bolog and the Plaintiff was
 3   something that I had raised for the first time here.
 4   It's something that they put in their answers or
 5   responses to requests for admission, which we provided,
 6   and it's Exhibit B to our opposition.  That Whiteford,
 7   Taylor, and Preston put in their responses to our request
 8   for admissions.
 9              THE COURT:  Okay.  Mr. Connolly, anything else
10   since it's is your motion?  You get the last word.
11              MR. CONNOLLY:  No, Your Honor.  It is true that
12   we -- that we included references to that agreement, but
13   it's not true that that undoes the arbitration agreement
14   in any particular.
15              THE COURT:  Okay.  All right.  So having
16   considered the filings of the parties, as well as the
17   argument presented thus far this morning, I'm going to
18   give you a decision on the arbitration motion.
19              So obviously, the parties have disagreed as to
20   what state's law applies to the analysis.  This Court
21   finds that Maryland law applies.  First, it's not
22   entirely clear to me that Ms. Engelhorn signed the
23   contract in Colorado.  Even if she did, as the Supreme
24   Court of Maryland held in *Laboratory Corporation of*
25   *America versus Hood*, 395 Md. 606, 621, quote, "The lex
```

1  loci contractus principle is not inflexible, and that it
2  does not apply to a contract provision which is against
3  public policy," unquote.
4          In *Bethlehem Steel versus G.C. Zarnas and
5  Company*, 304 Md. 183 at 188, the court noted that, quote,
6  "Merely because Maryland law is dissimilar to the law of
7  another jurisdiction does not render the latter contrary
8  to Maryland public policy, and that for another state's
9  law to be unenforceable, there must be a strong public
10 policy against enforcement in Maryland."
11         The Court does find that there's a strong
12 public policy in favor of applying Maryland law in this
13 case.  That policy would exist within the Rules of
14 Professional Conduct that apply to attorneys practicing
15 in this State.  I think Plaintiff's counsel had cited the
16 *Post vs. Bregman* case, 349 Md. 142, that that the Rules
17 of Professional Conduct are, in fact, a statement of
18 public policy that have the force of law.
19         So with the Maryland Rules of Professional
20 Conduct standing as a backdrop of what public policy is
21 in the State as it pertains to attorney conduct, as it's
22 been noted, the Rules 19-301.8(h)(1) clearly prohibits
23 agreements limiting an attorney's prospective liability
24 to a client without the client being represented
25 independently or being advised in writing of the

41

```
 1   desirability to seek an independent counsel, which was
 2   not done in this matter, the Court so finds.
 3            Furthermore, even if I was to apply Colorado
 4   law, as Whiteford, Taylor, and Preston argues, I would
 5   still find the provision to be unenforceable.  And if I
 6   found that the law of the District of Columbia applied,
 7   I'd reach the same result.
 8            This is because the Court finds that Plaintiff
 9   Engelhorn was not fully informed about the scope and
10   effect of the agreement.  So for these reasons, the
11   Court's going to deny Whiteford, Taylor, Preston's Motion
12   to Compel Arbitration.
13            So let's turn to the Motions to Dismiss on
14   substantive grounds.  And what I'd like to do is I'll
15   hear from both defense counsel, let Mr. Connolly respond
16   to all of it, and then turn back to defense counsel, go
17   in that direction.
18            So any references to who goes first?
19            MR. MURPHY:  Your Honor, I'm William Murphy,
20   also representing Whiteford.  I was going to argue the
21   Motion to Dismiss that Whiteford has filed.
22            THE COURT:  Okay, well, I'll hear from you
23   first, and then I'll turn it over to the Bolog
24   Defendants.
25            MR. MURPHY: Okay.  Thank you, Your Honor.
```